UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    No. 13-cr-201 (DWF/LIB)

v.                                           **REPORT AND RECOMMENDATION**

Alison Ann Brown,

                    Defendant.

---

This matter came before the undersigned United States Magistrate Judge upon Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers, [Docket No. 28] (hereinafter "Motion to Suppress Statements"), and Defendant's Pretrial Motion to Suppress Search and Seizure.  [Docket No. 27] (hereinafter "Motion to Suppress Evidence").  The case has been referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  The Court held a hearing on September 23, 2013, regarding the Defendant's motions for discovery[1] and suppression.  For reasons outlined below, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 28], be **DENIED**; and that Defendant's Motion to Suppress Evidence, [Docket No. 27], be **GRANTED**.


I.      **BACKGROUND**

Alison Ann Brown ("Defendant") was indicted on August 5, 2013, on a single count of Murder in the Second Degree, in violation of 18 U.S.C. §§ 1111, 1151, and 1153(a).  (Indictment [Docket No. 13]).[2]  She made the present Motions on September 10, 2013.  The Court held an

---

[1] Defendant's discovery motions were the subject of a separate Order.  [Docket No. 34].
[2] The Indictment alleges that Defendant and the alleged victim, Byron James Lussier, Sr., are both Indians, and that the alleged crime took place within the exterior boundaries of the Red Lake Indian Reservation, thus making federal jurisdiction appropriate under 18 U.S.C. §§ 1151 and 1153(a).  (See Indictment [Docket No. 13]).

evidentiary hearing on September 23, 2013, and at that time granted the parties' request for

additional time for briefing.  (See Minute Entry [Docket No. 32]).  Defendant submitted her

Memorandum in Support of her suppression motions on November 5, 2013.  (Def.'s Mem.

[Docket No. 41]); the Government submitted its Memorandum in Opposition on November 12,

2013.  (Gov't's Mem. [Docket No. 44]).  Defendant is presently scheduled to appear for trial

before the Hon. Donovan W. Frank on January 27, 2014.  (See Order [Docket No. 37]).


## II.   DEFENDANT' MOTION TO SUPPRESS STATEMENTS [Docket No. 28]

In her Memorandum, [Docket No. 41], Defendant argues only that the Court should

suppress statements that she made at the Red Lake Detention Center on July 4, 2013, during an

interview (the "jail interview") with FBI Special Agent Charles Bonser ("SA Bonser"), FBI

Special Agent Joe Ogden ("SA Ogden"), and Red Lake Criminal Investigator Geoff Pierre

("Investigator Pierre") (collectively, the "interviewing officers").  (Def.'s Mem. [Docket No. 41],

at 8-11).  However, in her Motion to Suppress Statements, Defendant also seeks suppression of

statements that she made earlier on the morning of July 4, 2013, to Red Lake Police Officer

Dominic Hamre ("Officer Hamre").  (See Docket No. 28).

### A.  Defendant's Statements to Officer Hamre

Defendant acknowledges that she made certain statements to Officer Hamre during the

early morning hours of July 4, 2013.  (See Mot. Suppress Statements [Docket No. 28], at 1-2;

Def.'s Mem. [Docket No. 41], at 3).  Defendant suggests that she was intoxicated at the time that

she made these statements, and generally argues that her statements should be suppressed

because she did not have assistance of counsel.  (See Mot. Suppress Statements [Docket No.

28]).  However, she makes no specific argument, either in her Motion to Suppress, [Docket No.

2

27], or in her Memorandum, [Docket No. 41], as to why her statements to Officer Hamre should be suppressed.

Because Defendant has not identified any specific reason that she believes her statements to Officer Hamre should be suppressed, and has offered no factual or legal grounds for suppression, the Court could recommend denying this part of her Motion solely on the basis that she has failed to meet her burden of production.  United States v. Jones, No. 09-cr-260 (DWF/RLE), 2009 U.S. Dist. LEXIS 112286, at *10 (D. Minn. Oct. 30, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); and United States v. Quiroz, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999) (Mason, M.J.), adopted by 57 F. Supp. 2d 805, 811 (D. Minn. 1999) (Kyle, J.)), adopted by 2009 U.S. Dist. LEXIS 112176 (D. Minn. Dec. 2, 2009) (Frank, J.).  "Nonetheless, in an abundance of caution, we proceed with address[ing] the merits of the [Defendants'] Motion . . . ."  Id. (citing United States v. Edwards, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Mayeron, M.J.), adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.)).

   **1.  Facts**[3]

During the early morning hours of July 4, 2013, Officer Hamre, who was on patrol on the Red Lake Indian Reservation,[4] heard over dispatch radio that Byron James Lussier, Sr., had been stabbed multiple times at his residence, and he also heard that Defendant had fled from the Lussier residence into some nearby woods.  (Hr'g Tr. [Docket No. 40], at 21:2–22:17; at 23:12). Officer Hamre knew that Defendant lived near the Lussier residence and proceeded directly to her residence; he arrived there shortly after 4:30 a.m.  (Id. at 22:18-24; at 44:13–45:8).  Upon

---

[3] The facts in this Part are derived from the testimony of Officer Hamre and SA Bonser, at the September 23, 2013, motions and evidentiary hearing.
[4] All locations described in this Report and Recommendation are within the exterior boundaries of the Red Lake Indian Reservation, unless otherwise noted.

arriving at Defendant's residence, Officer Hamre encountered a "[h]ighly intoxicated" man sitting on the front steps with a container of alcohol sitting next to him.  (Id. at 23:15-19; at 24:5-10).  The man gave his name as Melvin Brown ("Mr. Brown").  (Id. at 24:1-2).  Officer Hamre asked Mr. Brown if Defendant was home; Mr. Brown said that she was not, but that his sister Melanie and her children were in the residence.  (Id. at 25:19-22).  Officer Hamre then asked if he could enter the residence to check on the welfare of the children.  (Id. at 25:22-24).  Mr. Brown first asked Officer Hamre if he had a warrant to enter the residence, but ultimately Mr. Brown opened the door and invited Officer Hamre to enter.  (Id. at 26:1-10).

Upon entering the residence, Officer Hamre asked Mr. Brown where the children were, and then proceed to the bedroom that Mr. Brown had indicated where he found an individual on the bed wrapped in blankets.  (Id. at 26:13-18).  Officer Hamre then removed enough of the blankets to see the person's head; he asked her name, and she responded that she was Alison Brown, the Defendant.  (Id. at 20-24).  Officer Hamre radioed his superior, Red Lake Police Sergeant Harlan Johnson ("Sgt. Johnson"), that he had located Defendant, and Sgt. Johnson instructed Officer Hamre to place her under arrest.  (Id. at 27:4-6).

Officer Hamre advised Defendant that he was placing her under arrest, and he instructed her to get dressed.  (Id. at 27:16-18).  After Defendant was dressed, Officer Hamre cuffed her hands behind her back and advised her of her Miranda rights.[5]  (Id. at 27:18–28:6).[6]  Officer Hamre asked Defendant if she understood her Miranda rights, and she said that she did.  (Id. at 28:20-23).  However, he did not ask her any questions, but instead escorted her to his patrol vehicle and secured her in the back seat.  (Id. at 28:24–29:4).  At this time, Officer Hamre

---

[5] See Miranda v. Arizona, 384 U.S. 436 (1966).
[6] At the September 23, 2013, motions hearing, Officer Hamre stated that he did not read the Miranda warning from a card, but instead recited them from memory, as follows:  "You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have a right to an attorney.  If you cannot afford an attorney, one will be provided to you.  Do you understand these rights?"  (Hr'g Tr. [Docket No. 28], at 8:8-20).

observed a strong odor of alcohol coming from Defendant's breath and her person, and he noted

that her eyes were watery and bloodshot.  (Id. at 41:15–42:1).  Defendant remained in Officer

Hamre's patrol vehicle for approximately 30 minutes until another officer arrived to secure the

scene.  (Id. at 30:5-12).  At that time, Officer Hamre transported Defendant to the Red Lake

Detention Center.

Officer Hamre testified at the September 23, 2013, motions hearing that he did not ask

Defendant any questions during her transport, and that he did not initiate conversation with her in

any way.  (Id. at 30:17-24).  During the transport, Defendant advised Officer Hamre that she

wished to make a statement to him.  (Id. at 30:25–31:5).  Officer Hamre responded that she

would have to sign a form waiving her Miranda rights before he could ask her any questions.

(Id. at 31:6-9).  Nonetheless, Defendant proceeded to make a spontaneous statement to Officer

Hamre.  (Id. at 31:10-14; at 32:10-15).  He again advised Defendant that she would have to sign

a Miranda waiver before he could ask her any questions.  (Id. at 32:16-19).  There was no further

conversation during the transport.  (Id. at 32:20-24).

Upon arrival at the Red Lake Detention Center at approximately 5:30 a.m., Officer

Hamre again advised Defendant of her Miranda rights.  (Id. at 32:25–33:12; at 45:9-11).  Officer

Hamre did not question Defendant at the Red Lake Detention Center, in part because

Investigator Pierre advised him that he would take a statement from Defendant after she had

sobered up.  (Id. at 33:15-23; at 46:4-9)  However, Officer Hamre did administer a preliminary

breath test ("PBT"), which recorded Defendant's blood-alcohol content as 0.125 percent.  (Id. at

33:24–34:17).  In addition to that measurement, Officer Hamre observed other signs that

Defendant was intoxicated, including watery and bloodshot eyes and an odor of alcohol from her

breath and her person.  (Id. at 34:18–35:3).  At the September 23, 2013, motions hearing, Officer

Hamre described Defendant's condition at the time of booking as: "I wouldn't say that she was overly intoxicated, but she was not sober by any means." (Id. at 35:18-20).

### 2. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of [their] [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, "[v]oluntary statements that are not in response to interrogation are admissible with or without the giving of Miranda warnings." United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005).

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). "When a suspect in custody makes spontaneous statements to an officer, no interrogation can be imputed to the officer." United States v. Martinez, No. 12-cr-26(2) (JRT/JSM), 2012 U.S. Dist. LEXIS 175978, at *9 (D. Minn. Dec. 12, 2012) (citing United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997)).

### 3. Discussion

There is no dispute that Defendant was in custody during the early morning hours of July 4, 2013, when she made statements to Officer Hamre while in transit to the Red Lake Detention

Center. Additionally, the evidence in the record indicates that prior to transport Officer Hamre had advised Defendant of her Miranda rights, and that he had not engaged Defendant in any conversation whatsoever except to tell her that he could not ask her any questions unless and until she executed a Miranda waiver.[7] "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." Hayes, 120 F.3d at 744. On the present record, Defendant's statements during transport can only be described as "spontaneous statements to an officer," which do not run afoul of Miranda.

Although Defendant makes no specific argument concerning why her spontaneous statements to Officer Hamre during transport should be suppressed, she makes repeated references to her own intoxication, suggesting a belief that her statements should be suppressed on that basis. (See Mot. Suppress Statements [Docket No. 28], at 1-2; Def.'s Mem. [Docket No. 41], at 3).

When considering whether a defendant's waiver of her Miranda rights was "made voluntarily, knowingly and intelligently," the Eighth Circuit has held that the defendant's alcohol use and/or intoxication are "relevant to our analysis." United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008). However, in the present case the Court is not presented with the issue of whether Defendant "voluntarily, knowingly and intelligently" waived her Miranda rights, because her statements to Officer Hamre were spontaneous statements that fall outside the dictates of Miranda. Defendant has provided no case law, and the Court is not aware of any,

---

[7] Although Officer Hamre told Defendant that he could not question her unless and until she signed a Miranda waiver, the U.S. Supreme Court has held that a written waiver is not required: "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Binion, 570 F.3d 1034, 1041 (defendant who refused to sign a written Miranda waiver nonetheless knowingly and intelligently waived his Miranda rights by volunteering incriminating information after being advised of his rights).

suggesting that a person's spontaneous statements to law enforcement may be suppressed solely on the basis of that person's intoxication.

Because Defendant's statements to Officer Hamre while being transported to the Red Lake Detention Center during the early morning hours of July 4, 2013, were spontaneous statements, the Court recommends that, with regard to her statements to Officer Hamre, Defendant's Motion to Suppress Statements, [Docket No. 27], be **DENIED**.

### B.  Defendant's Statements during the jail interview

Defendant asserts that she invoked her right to counsel twice during the subsequent jail interview, and argues (1) that the entire second portion of the jail interview should be suppressed because it occurred after she first invoked her right to counsel; and, in the alternative, (2) that Court should suppress the any statements Defendant made after she arguably invoked her right to counsel for a second time.  (Def.'s Mem. [Docket No. 41], at 8-11).

### 1.  Facts[8]

On the morning of July 4, 2013, SA Bonser, SA Ogden and Investigator Pierre (the "interviewing officers") conducted an interview of Defendant at the Red Lake Detention Center. (Gov't's Ex. 4-1, at 1; Hr'g Tr. [Docket No. 40], at 50:14-19).[9]  All three interviewing officers

---

[8] The facts in this Part are derived from the testimony of SA Bonser, at the September 23, 2013, motions and evidentiary hearing, and from the following Exhibits, which were offered, and the Court accepted into evidence, for purposes of the present Motions:
- **Government's Exhibit 2**: an FBI Advice of Rights form, signed and executed by Defendant at the Red Lake Detention Center on July 4, 2013, at 10:45 a.m., and witnessed by SA Bonser and SA Ogden;
- **Government's Exhibit 3**: a compact disc containing two audio recordings, each of which is a recording of an interview of Defendant conducted by SA Bonser, SA Ogden, and Investigator Pierre, at the Red Lake Detention Center on July 4, 2013.  The first recording begins at approximately 10:42 a.m. and runs approximately 19 minutes.  The second recording begins at approximately 11:03 a.m. and runs approximately 34 minutes; and
- **Government's Exhibit 4**: transcripts of the audio recordings of the interviews of Defendant that SA Bonser, SA Ogden, and Investigator Pierre conducted at the Red Lake Detention Center on July 4, 2013.  Because the interview was conducted in two parts, Government's Exhibit 4 contains two separately paginated transcripts, which the Court will identify as Gov't's Ex. 4-1 and Gov't's Ex. 4-2.

[9] The Court has reviewed the recordings contained on Government's Exhibit 3 and finds that they are accurately transcribed in the transcripts contained in Government's Exhibit 4.  Accordingly, all references to the time within

were wearing plain clothes, and in accordance with Red Lake Detention Center policy all three were unarmed. (Hr'g Tr. [Docket No. 40], at 51:3-12). The interview began at approximately 10:42 a.m., and SA Bonser testified at the September 23, 2013, motions hearing that he did not observe any signs that Defendant was intoxicated at the time of the interview. (Gov't's Ex. 4-1, at 1; Hr'g Tr. [Docket No. 40], at 51:18-20). SA Bonser recorded the interview. (Gov't's Ex. 3; Hr'g Tr. [Docket No. 40], at 52:13-16; at 55:13-15).

At the outset of the interview, SA Bonser advised Defendant of her <u>Miranda</u> rights, and at 10:46 a.m., Defendant signed a FBI Advice of Rights form waiving her right to have an attorney present during questioning. (Gov't's Ex. 2; Gov't's Ex. 4-1, at 2; Hr. Tr. [Docket No. 40], at 52:17–55:12). After Defendant signed the Advice of Rights form, she answered the interviewing officers' questions for several minutes. (Gov't's Ex. 4-1, at 2-10). However, approximately 19 minutes into the recording, Defendant said: "I need a lawyer." (<u>Id.</u> at 4-1, 11; Hr'g Tr. [Docket No. 40], at 69:17-23). SA Bonser responded, "Alright," and announced that he was terminating the interview. (<u>Id.</u>). At that time, he stopped the recording. (Hr'g Tr. [Docket No. 40], at 56:22-25). This first portion of the jail interview lasted a little more than 19 minutes, and ended at approximately 11:02 a.m. (Gov't's Ex. 4-1, at 11).

During the September 23, 2013, motions and evidentiary hearing, SA Bonser testified that when Defendant said that she needed an attorney, he and the other interviewing officers began to pack up their possessions to leave. (Hr'g Tr. [Docket No. 40], at 57:1-2; at 69:24–70:4). However, while they were packing up and after he had stopped recording, Defendant said that she would like to continue with the interview: "[S]he . . . basically said that she still wanted

---

the interviews are references to the recordings contained on Government's Exhibit 3, and all citations concerning details of the jail interview are to the transcripts contained in Government's Exhibit 4.

to talk to us." (Id. at 56:3-6; at 57:24–58:2; at 70:16–71:3).  SA Bonser testified that he did not

do anything to make Defendant want to restart the interview.  (Id. at 71:10-12).[10]

Approximately 1 minute after he had stopped the first recording, SA Bonser began a

second recording at 11:03 a.m., and stated that Defendant "has decided that she would like to

speak with us again."  (Gov't's Ex. 4-2, at 1).  He again advised Defendant of her Miranda

rights, and Defendant stated that she understood those rights.  (Id.; Hr'g Tr. [Docket No. 40], at

57:8-23).  Approximately 5 minutes into the second interview, SA Bonser tells Defendant that he

would like to collect a DNA sample by taking a swab from inside her mouth, and he provides her

with a "Consent to Search" form.  (Id. at 2-3).  Defendant says, "I shouldn't," and the following

exchange takes place:

> SA BONSER: This is your chance to, to show.  I mean show that your DNA's not
> going to be on that knife.  This is how you're going to prove it.  Is by giving us
> your DNA so that we can compare your DNA with the knife
>
> Background noise.
>
> ALISON BROWN: I ain't sure what the hell I am doing without a lawyer.  I
> really don't know what I am doing.  I can sign this paper and where would this?
>
> SA BONSER: This, you're telling me that your DNA is not going to be on that
> knife or it shouldn't be on that knife.  This is how you prove that your DNA is not
> on that knife.  By you giving us consent to take a DNA sample.  We'll take the
> DNA sample and then we'll mo-take it to the lab and have it compared with the,
> the knife.  And if your blood or if your DNA is not on that knife.  That's, that's
> how you're going to prove it.  Cause otherwise it's just you saying that it's not on
> there.  But this is how you prove that it's not on there.
>
> ALISON BROWN: Guys, I really think that I should talk to a lawyer before I go
> any further by myself.  Because right now talking for myself and I don't really
> know the laws about it.  I still don't believe you about Byron.  I have to fig-I have
> to accept reality before I can actually go ahead with myself because now, I gotta
> except [sic] the fact to [sic] that he's gone.  I don't believe yous [sic].  I am sorry,
> I know you guys are telling me the truth but.
>
> SA BONSER: I don't know why you'd think we'd lie about that.

---

[10] SA Bonser acknowledged that SA Ogden might have said something to Defendant, but he did not recall what SA
Ogden might have said.  (Id. at 70:20–71:16).  SA Ogden was not called to testify by either party.

ALISON BROWN: I'd have to hear it from my own family.  My own.  I am sorry.

SA BONSER: So you don't want to provide a DNA sample, is that what you're saying?

ALISON BROWN: I am saying I should talk to somebody before I sign any more papers.

SA BONSER: Okay.

ALISON BROWN: Because I don't know where, I don't accept.  I have to accept that I don't accept what you guys told me but it must be true.  When, I got to take it into my own head.

SA BONSER: Alright.  I'll have the pen.

(Id. at 3-4; see also Hr'g Tr. [Docket No. 40], at 72:19–74:18 (defense counsel questioning SA Bonser about this exchange)).  Defendant did not ask for, or make any other reference to, an attorney after this exchange, and at no time during this second portion of the jail interview did she ask to end the interview.  (Id. at 4-14; Hr'g Tr. [Docket No. 40], at 76:20-21).

After the exchange transcribed above, the interviewing officers continued to question Defendant, and SA Bonser took photographs of her hands, face, and jaw.  (Id. at 4-13; Hr'g Tr. [Docket No. 40], at 67:14–68:11).  This second portion of the jail interview lasted approximately 35 minutes, and ended at approximately 11:38 a.m.  (Gov't's Ex. 4-2, at 14).

## 2.  Standard of Review

"When a suspect requests counsel during an interrogation, police must cease questioning until counsel has been made available or the suspect reinitiates communication with the police." United States v. Havlik, 710 F.3d 818, 821 (8th Cir. 2013) (citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)).  "The Supreme Court clarified the Edwards rule [by holding that t]o implicate Edwards, a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  Id. (quoting Davis v. United States, 512 U.S. 452, 459 (1994)).

11

"Applying these principles, the Court in <u>Davis</u> held the statement '[m]aybe I should talk to a lawyer' was equivocal, and not an invocation of the right to counsel for purposes of <u>Miranda</u> and <u>Edwards</u>." <u>Id.</u> (quoting <u>Davis</u>, 512 U.S. at 462) (emphasis added).

Additionally, a defendant's waiver of her <u>Miranda</u> rights must be made voluntarily, knowingly, and intelligently.  <u>Miranda</u>, 384 U.S. at 444.

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived [her] rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

<u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

"The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence."  <u>United States v. Haggard</u>, 368 F.3d 1020, 1024 (8th Cir. 2004). The court "must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'"  <u>United States v. Syslo</u>, 303 F.3d 860, 866 (8th Cir. 2002) (quoting <u>United States v. McClinton</u>, 982 F.2d 278, 282 (8th Cir. 1992)).  The U.S. Supreme Court has explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent."  <u>United States v. Turner</u>, 157 F.3d 552, 555 (emphasis in original) (quoting <u>United States v. Bradshaw</u>, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was voluntary, knowing, and intelligently made, a court "looks at the totality of the circumstances and must determine whether the individual's will was

overborne." Syslo, 303 F.3d at 866.

    **3.  Discussion**

    The evidence presently in the record shows that after Defendant first invoked her right to

counsel, she then "reinitiate[d] communication" with the interviewing officers, thereby allowing

them to proceed with the second part of the jail interview.  Additionally, the evidence indicates

that when Defendant arguably invoked her right to counsel for the second time, she did so for the

limited purpose of seeking advice with regard to the officers' request that she sign the "Consent

to Search" form and provide them with a DNA sample.  Defendant's limited invocation of the

right to counsel related to collection of a DNA sample did not preclude the interviewing officers

from proceeding to question her about other subjects.

> **a.  After Defendant first invoked her right to counsel, she reinitiated
>     communication with the interviewing officers, who were then allowed
>     to continue questioning her.**

    There is no question that Defendant unequivocally invoked her right to counsel when,

approximately 19 minutes into the first part of the jail interview, she stated: "I need a lawyer."

Thus, the interviewing officers were required to "cease questioning until counsel has been made

available *or the suspect reinitiates communication with the police*."  Havlik, 710 F.3d at 821

(emphasis added).  On the present record, the evidence is that Defendant reinitiated

communication with the interviewing officers.  (Hr'g Tr. [Docket No. 40], at 58:1-2 (Defendant

"basically said that she still wanted to talk to us")).  Thus, the interviewing officers were allowed

to continue their interview with Defendant.

    Defendant seeks to evade this conclusion by suggesting that she was coerced into

reinitiating communication with the interviewing officers and, therefore, that any waiver effected

by reinitiating communication was not voluntary.[11]  (Def.'s Mem. [Docket No. 41], at 10-11

(Defendant's "request for a lawyer was not respected and Ms. Brown was essentially coerced

into continuing with the interrogation")).  However, Defendant's argument is based merely upon

supposition that is not supported by any evidence in the record.  Defendant asserts that "it is clear

that Agent Ogden continued talking to Ms. Brown despite her request for a lawyer."  (Id. at 10).

However, the evidence in the record demonstrates only that SA Ogden *might have* spoken with

Defendant.  (Hr'g Tr. [Docket No. 40], at 70:21-23 ("Agent Ogden **may have been talking to**

**her**, but I don't recall exactly what was said" (emphasis added)); at 71:13-16 ("Q. But again, you

don't remember what Agent Ogden said?  A. I can't recall exactly what he said, no.  But I do

remember that there **may have been** discussion between the two of them" (emphasis added)).

Even assuming that SA Ogden did speak with Defendant during the period when SA Bonser's

recorder was turned off, the evidence in the record does not establish that SA Ogden initiated

such discussion, as opposed to, merely responded to something that Defendant said.

　　　　More important, even if there was a brief conversation between SA Ogden and Defendant

while the recorder was turned off, and even if that conversation was initiated by SA Ogden, there

is no evidence in the record that SA Ogden in any way "coerced" Defendant into reinitiating the

interview, or in any other way took any action that would render Defendant's second waiver of

her Miranda rights involuntary.  There is no evidence of any "coercive police activity" by the

interviewing agents during the recorded portions of the jail interview, and Defendant offered no

evidence that SA Ogden, or either of the other interviewing officers, engaged in coercive activity

---

[11] Defendant does not suggest that the waiver effected by her reinitiating communication with the interviewing officers was not knowing or intelligent.  Thus, the Court considers only the question that Defendant does present: whether such waiver was voluntary.  See United States v. Morgan, 729 F.3d 1086, ___ (pagination unavailable), 2013 U.S. App. LEXIS 18758, at *11 (8th Cir. Sept. 10, 2013) ("'[T]here is no contention that [Morgan] did not understand his rights; and from this it follows that he knew what he gave up when he spoke'" (quoting Berghuis v. Thompkins, 560 U.S. 370, 385 (2010)) (alterations in Morgan)).

during the time (approximately 1 minute) that the recorder was not recording.  Because such coercive activity is a prerequisite to finding that a waiver was involuntary, see Connelly, 479 U.S. at 167, and Turner, 157 F.3d at 555, the Court cannot find on this record that Defendant's reinitiation of communication with the interviewing officers was involuntary.  See United States v. Morgan, 729 F.3d 1086, ___ (pagination unavailable), 2013 U.S. App. LEXIS 18758, at *11 (8th Cir. Sept. 10, 2013).

On the present record, the preponderance of the evidence demonstrates that, after first invoking her right to counsel, Defendant reinitiated communication with the interviewing officers, and thereby again voluntarily waived her right to have counsel present during that interview.  Additionally, there is no evidence whatsoever in the present record to support Defendant's mere supposition that her second waiver was coerced.  Therefore, the Court recommends that, with regard to her request that the entire second portion of the jail interview be suppressed, Defendant's Motion to Suppress Statements, [Docket No. 28], be **DENIED**.

> **b.  Defendant's limited invocation of her right to counsel with regard to the interviewing officers' request for a DNA sample and the "Consent to Search" form did not bar the officers from proceeding with the interview.**

Defendant, citing to the exchange recounted on pages 10-11, supra, argues that she invoked her right to counsel a second time, after the interviewing officers asked her for a DNA sample and asked her to sign a "Consent to Search" form.  (Def.'s Mem. [Docket No. 41], at 11 ("Although Ms. Brown's second attempt to get a lawyer was not as direct as her first invocation, it should have been clear to anyone in the interrogation room that Ms. Brown wanted a lawyer.")).

However, the evidence in the record does not support Defendant's assertion that she invoked her right to counsel for all purposes, but instead it shows only that she refused to provide

a DNA sample or sign the "Consent to Search" form without the advice of counsel.  Defendant

suggests that the interviewing officers should have at least clarified her intent with regard to

having a lawyer present.  However, "[t]here is no requirement that an officer must ask clarifying

questions when a suspect makes an ambiguous statement regarding counsel."  Havlik, 710 F.3d

at 818 (citing Davis, 512 U.S. at 461).  More important, Defendant's statement was not

ambiguous—she plainly limited the scope of her request for counsel when she said: "I am saying

I should talk to somebody *before I sign any more papers*," (Gov't's Ex. 4-2, at 4 (emphasis

added)), in the context of SA Bonser's request to collect a DNA sample.

The distinction between a general invocation of the right of counsel and a limited request

for counsel for a particular purpose is critical, because the Eighth Circuit has repeatedly held that

"a limited invocation of the right to counsel does not preclude the admissibility of statements a

defendant makes which fall outside the limited invocation."  United States v. Boyer, 914 F.2d

144, 146 (8th Cir. 1990); see also United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996)

(citing Connecticut v. Barrett, 479 U.S. 523, 529 (1987)); United States v. Wetsch, No. 12-cr-45

(SRN/JJG), 2013 U.S. Dist. LEXIS 51682, at *79 (D. Minn. Feb. 8, 2013) (Graham, M.J.) ("A

court may still admit statements made after a conditional invocation of the right to counsel, so

long as the statements fall outside the conditions delineated by the suspect.") (citing Jacobs and

Boyer), adopted by 2013 U.S. Dist. LEXIS 50652 (D. Minn. Apr. 9, 2013) (Nelson, J.).

The Eighth Circuit's opinion in Jacobs is particularly helpful because of the similarities

between that case and the present case.  In Jacobs, the defendant was being interviewed by police

when he "said he would want a lawyer in the even he had to take a polygraph test," but "did not

request a lawyer at any other time."  97 F.3d at 280.  However, the defendant ultimately did not

take a polygraph test.  Id.  The Eight Circuit affirmed the district court's finding that the

defendant's statements were admissible because he had merely made a limited invocation of the right to counsel, and that because he did not take a polygraph test he was not denied his right to counsel.  Id.  Similarly, in the present case, Defendant merely made a limited invocation of her right to counsel by stating that she did not want to provide a DNA sample or sign the related "Consent to Search" form without the advice of counsel.  Because she ultimately did not provide a DNA sample or sign the related "Consent to Search" form during the jail interview, Defendant was not denied her right to counsel, and her statements in response to questions on other subjects are admissible.

Accordingly, the Court recommends that, in regard to her alternative request that her statements made after she requested advice of counsel related to providing a DNA sample or signing the "Consent to Search" form, Defendant's Motion to Suppress Statements, [Docket No. 28], be **DENIED**.


III.    **MOTION TO SUPPRESS EVIDENCE [Docket No. 27]**

Defendant argues that the warrant that authorized law enforcement to search her mobile phone failed to set forth probable cause to do so and, therefore, that any evidence obtained from that search should be suppressed.  (Def.'s Mem. [Docket No. 41], at 12-16).  The Government asserts that no warrant was required because Defendant abandoned the phone; additionally, the Government argues that the search warrant application properly set forth probable cause to search the phone, and that even if the application was lacking that search was valid under the Leon[12] "good faith" rule.  (Gov't's Mem. [Docket No. 44], at 12-15).

---

[12] United States v. Leon, 468 U.S. 897 (1984).

A. **Facts**[13]

While processing the crime scene the morning of July 4, 2013, law enforcement officers found a black Android mobile phone underneath one of the sofas in the living room of the residence. (Hr'g Tr. [Docket No. 40], at 59:15–60:3; at 75:19-20; Gov't Ex. 1, Aff. Bonser, at 3, ¶ 18). SA Bonser touched one of the phone's buttons to see if the phone still had power, and in response, the phone displayed an image of Defendant and an unknown female. (Hr'g Tr. [Docket No. 40], at 60:6-12; at 62:11-21; Gov't Ex. 1, Aff. Bonser, at 3, ¶ 18). The officers seized the phone as evidence, but they could not immediately determine to whom the phone belonged. (Hr'g Tr. [Docket No. 40], at 59:13-18). Later that morning, during the jail interview, Defendant acknowledged that she owned a black Android mobile phone. (Gov't Ex. 4-2, at 8; Hr'g Tr. [Docket No. 40], at 75:6-18; Gov't Ex. 1, Aff. Bonser, at 3, ¶ 19). However, she said that she did not know where the phone was, and that "[i]t might have got lost somewhere," possibly while she was at the Lussier residence.[14]  (Gov't Ex. 4-2, at 8; Gov't Ex. 1, Aff. Bonser, at 3, ¶ 19).

Subsequently, on July 11, 2013, SA Bonser applied for a warrant to search the mobile phone, which he identified by make, model, and serial number, for "electronically stored information in any form" on the phone. (Gov't Ex. 1, Warrant; Aff. Bonser, at 4, ¶¶ 22-24). In his Affidavit, SA Bonser set forth the following facts: In the early morning hours of July 4, 2013, law enforcement was called to the Lussier residence, where they found Mr. Lussier lying on the

---

[13] The facts in this Part are derived from the testimony of SA Bonser at the September 23, 2013, motions and evidentiary hearing, and from the following Exhibits, which were offered, and the Court accepted into evidence, for purposes of the present Motions:

- **Government's Exhibit 1**: the Application for Search Warrant and Supporting Affidavit presented to the Hon. Mary Kay Klein, U.S. Magistrate Judge, on July 11, 2013; and
- **Government's Exhibit 4**: transcripts of the audio recordings of the interviews of Defendant that SA Bonser, SA Ogden, and Investigator Pierre conducted at the Red Lake Detention Center on July 4, 2013.

[14] Earlier in the jail interview, Defendant had said that her aunt, D.Y., and Mr. Lussier, who was her aunt's boyfriend, picked up her and some other people, and brought them back to the Lussier residence to "hang out" and drink. (Gov't Ex. 1-1, at 2-3).

floor with multiple stab wounds.  (Gov't's Ex. 1, Aff. Bonser, at 1-2, ¶¶ 6-7).  Mr. Lussier was

taken by ambulance to the Red Lake Hospital, where he was pronounced dead.  (Id. at 2, ¶ 8).  A

witness identified as Witness No. 1 told Investigator Pierre that he/she was at the Lussier

residence when he/she heard Defendant first arguing, and then physically fighting.  (Id. at 2, ¶¶

9-10).  Witness No. 2 told SA Bonser and Investigator Pierre that he/she saw Defendant "arm

herself" with a large grilling fork.  (Id. at 2, ¶ 11).  Witness No. 2 said that he/she was able to

wrest the fork away from Defendant, but that Defendant then obtained "a large kitchen knife"

and stabbed Mr. Lussier multiple times.  (Id. at 2, ¶¶ 11-12).  Witness No. 2 said that Defendant

then "armed herself with a smaller knife," and that Mr. Lussier collapsed to the floor.  (Id. at 2-3,

¶¶ 13-14).  Witness No. 3 told Investigator Pierre that he/she forced Defendant from the Lussier

residence, and the witnesses said that Defendant fled on foot.  (Id. at 3, ¶¶ 15-16).  SA Bonser

then related how investigators found the phone, which matched the description that Defendant

later gave of her own phone.  (Id. at 3, ¶¶ 18-19).  Based on those facts, SA Bonser stated that he

"believe[d] that on [the mobile phone] there could possibly be evidence of the above crimes,"

and sought authorization to search for photographs and/or any other electronically stored

information on the phone.  (Id. at ¶¶ 18-19 (emphasis added)).  The Hon. Mary Kay Klein, U.S.

Magistrate Judge, granted the application and signed the warrant, which authorized the search of

the phone, on July 11, 2013.  (Gov't's Ex. 1, Warrant).

Additionally, at the September 23, 2013, motions hearing, SA Bonser testified that

investigators sought to search the phone in order to determine "who the phone belonged to and

what was on it."  (Hr'g Tr. [Docket No. 40], at 62:15-16).  For example, he said, if someone had

used the phone to take pictures or record audio or video during the alleged fight between

Defendant and Mr. Lussier, such evidence might have been recorded on the phone.  (Id. at 79:9-

21).  SA Bonser testified that he <u>hoped</u> a search of the phone's electronically stored information

<u>might</u> reveal whether there was any communication between Defendant and any of the other

parties before Mr. Lussier was stabbed.  (<u>Id.</u> at 80:7-10).  However, he acknowledged that he had

no information suggesting that Defendant had conspired or otherwise worked in concert with any

other person in allegedly committing the crime she is charged with.  (<u>Id.</u> at 78:9-14).

**B.  Standard of Review**

The Fourth Amendment provides that "the right of people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. amend. IV.  The Eighth Circuit has explained that "[a]n affidavit for a search warrant

need only show facts sufficient to support a finding of probable cause."  <u>United States v. Parker</u>,

836 F.2d 1080, 1083 (8th Cir. 1987).  "Probable cause is a fluid concept that focuses on 'the

factual and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act.'"  <u>United States v. Colbert</u>, 605 F.3d 573, 576 (8th Cir. 2010) (quoting

<u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983)).  "The existence of probable cause depends on

whether, in the totality of the circumstances, 'there is a fair probability that contraband or

evidence of a crime will be found in a particular place.'"  <u>United States v. Solomon</u>, 432 F.3d

824, 827 (8th Cir. 2005) (quoting <u>United States v. Murphy</u>, 69 F.3d 237, 240 (8th Cir. 1995)

(quoting, in turn, <u>Gates</u>, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a

hypertechnical approach."  <u>United States v. Grant</u>, 490 F.3d 627, 632 (8th Cir. 2007) (citation

and internal quotations omitted).  "Therefore, '[w]hen the [issuing judge] relied solely upon the

supporting affidavit to issue the warrant, only that information which is found in the four corners

of the affidavit may be considered in determining the existence of probable cause.'"  <u>United</u>

States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 U.S. Dist. LEXIS 116899, at *6 (D. Minn. Dec.

15, 2009) (Tunheim, J.) (quoting Solomon, 432 F.3d at 827) (alterations in original).  "In ruling

on a motion to suppress, probable cause is determined based on 'the information before the

issuing judicial officer.'"  United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting

United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)).  Nevertheless, "[a] magistrate's

'determination of probable cause should be paid great deference by reviewing courts.'"  Gates,

462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  "[T]he duty of a

reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

[concluding]' that probable cause existed."  Gates, 462 U.S. at 238-39 (quoting Jones v. United

States, 362 U.S. 257, 271 (1960)).

## C. Discussion

### 1. Defendant had a reasonable expectation of privacy in her mobile phone, and the "abandoned property" exception does not apply in the present case.

Defendant first asserts that she "has a reasonable expectation of privacy in [her] cellular

phone and the content of the information stored on the phone."  (Def.'s Mem. [Docket No. 40],

at 12).  Although it appears that neither the Eighth Circuit nor the District of Minnesota has made

such an unequivocal statement,[15] the Government does not contest the initial assertion that

Defendant had a reasonable expectation of privacy in her mobile phone, but instead argues that

Defendant waived that expectation of privacy by abandoning the phone.  (Gov't's Mem. [Docket

---

[15] In support of this proposition, Defendant cites to Grant, 490 F.3d at 631, which she describes as "holding that a legitimate expectation of privacy generally arises in one's personal computer."  (Def.'s Mem. [Docket No. 41], at 12-13).  In fact, in Grant the Eighth Circuit merely "*assume[d] only for the sake of discussion* that [the defendant] had a reasonable expectation of privacy in the contents of the computer."  490 F.3d at 631, n.4 (emphasis added).

   Defendant also cites to United States v. Zavala, 541 F.3d 562 (5th Cir. 2008), in which the Fifth Circuit held that "cell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers.  [The defendant] had a reasonable expectation of privacy regarding this information."  Id. at 577; see also United States v. Finley, 477 F.3d 250, 258-59 (5th Cir. 2007) (holding that defendant "had a reasonable expectation of privacy in the call records and text messages" on a cell phone provided by his employer).

No. 44], at 12-14).  Thus, before proceeding to the question of whether the "abandoned property rule" applies, the Court may here assume, without deciding, that Defendant initially had a reasonable expectation of privacy in her mobile phone.  Accord United States v. Hollister, No. 12-cr-13 (PJS/TNL), 2012 U.S. Dist. LEXIS 134091, at *43 (D. Minn. July 23, 2012) (Leung, M.J.) (where it was undisputed that the defendant had standing to challenge a warrant to search his mobile phone, court proceeded to analyze the warrant), adopted by 2012 U.S. Dist. LEXIS 131098 (D. Minn. Sept. 14, 2012) (Schiltz, J.).

"It is well established that the warrantless search of abandoned property does not constitute an unreasonable search and does not violate the Fourth Amendment."  United States v. James, 534 F.3d 868, 873 (8th Cir. 2008) (quoting United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993) (citing, in turn, Abel v. United States, 362 U.S. 217, 241 (1960))).  When determining whether a defendant abandoned property, the Eighth Circuit directs the Court to consider two factors: "first, whether [the defendant] denied ownership of the item, and second, whether [she] physically relinquished the item."  United States v. James, 353 F.3d 606, 616 (8th Cir. 2003) (citing United States v. Landry, 154 F.3d 897, 899 (8th Cir. 1998)).  "The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished her reasonable expectation of privacy so that the search and seizure is valid."  Hoey, 983 F.2d at 892-93.  "The government bears the burden of showing property has been abandoned."  United States v. Hawkins, 116 Fed. Appx. 776, 778 (8th Cir. unpub. 2004) (citing James, 353 F.3d at 616).

In the present case, the Government has not demonstrated that Defendant abandoned her mobile phone.  Defendant did not deny ownership of the phone, but instead, when asked during the jail interview whether she had a mobile phone she said that she did and she described it as a

black Android.  Additionally, there is no evidence in the record that Defendant "physically

relinquished" or otherwise "abandoned" her mobile phone in the normal sense of those words,

which would imply that she did not intend to recover the phone,[16] or that she in any other way

abandoned the phone such that she had "relinquished her reasonable expectation of privacy" in

it.  Hoey, 983 F.2d at 892-93.  The only evidence in the record is that Defendant did not know

where her phone was, and did not know precisely when she had lost it.

The Government argues that "there is nothing in the record that supports the defense

argument that the phone was left at the crime scene 'accidentally.'"  (Gov't Mem. [Docket No.

44], at 13-14).  The Government further suggests that, because the mobile phone was found at

the crime scene and "was not seized from [Defendant's] person or her home," that it should be

considered abandoned property.  (Id. at 13).  However, as previously noted, it is the

Government's burden to show that potential evidence was abandoned, not the Defendant's

burden to show that the evidence was not abandoned.  James, 353 F.3d at 616; Hawkins, 116

Fed. Appx. 778.  The Government has made no such showing.

Additionally, the Government argues that "[t]here is no legal support for the argument

that the government must show that the defendant made a voluntary decision to abandon the cell

phone."  (Gov't Mem. [Docket No. 44], at 14).  However, as previously noted, the Eighth

Circuit in Hoey held that the abandoned property rule applies only where property has been left

or discarded in such a way as to surrender any reasonable expectation of privacy.  983 F.2d at

892-93.  Additionally, in each of the cases that the Government cites, the defendant either

discarded the property at issue during active pursuit by law enforcement, or left the property at

issue in the trash in a location that the defendant had vacated—in either case, clearly

---

[16] Black's Law Dictionary provides multiple definitions of "abandonment," but each definition states that
abandonment connotes an intention not to reclaim that which has been abandoned.  Black's Law Dictionary 2 (9th
ed. 2009).

relinquishing any expectation of privacy in that property.[17]  Conversely, it has been held that the abandoned property rule did <u>not</u> apply where the defendant, although not in physical possession of the property at issue, did not relinquish their property in a manner that suggested that they had surrendered their expectation of privacy in it.[18]

The abandoned property rule requires that the Government demonstrate that a defendant relinquished the property at issue such that she no longer had any reasonable expectation of privacy in it.  In the present case, the Government has not done so.  Accordingly, the abandoned property rule does not apply.  However, this does not mean that the Government's search of Defendant's mobile phone was invalid; it merely means that the Government was not entitled to conduct a *warrantless* search of the phone.  Here, the Government obtained a warrant before searching Defendant's mobile phone; thus, the Court proceeds to consider effect of the warrant.

### 2.  The search warrant

Defendant argues that the search warrant lacked probable cause for two reasons: (1) because it did not describe with particularity the evidence sought, and (2) because the warrant application did not establish any nexus between the alleged crime and the mobile phone in question.

---

[17] See <u>Abel</u>, 362 U.S. at 241 (abandoned property rule applied to papers found in wastebasket of a hotel room that the defendant had vacated); <u>United States v. Taylor</u>, 462 F.3d 1023, 1026 (8th Cir. 2006) (abandoned property rule applied to cell phone, handgun, and bag that the defendant discarded after exiting his vehicle and fleeing police on foot); <u>California v. Hodari D.</u>, 499 U.S. 621, 629 (1991) (summarizing <u>Hester v. United States</u>, 265 U.S. 57, 58 (1924) (abandoned property rule applied to containers dropped by moonshiners during law enforcement pursuit)); <u>United States v. Smith</u>, 648 F.3d 654, 660 (8th Cir. 2011) (abandoned property rule applied when defendant "'left the car open, with the keys in the ignition, the motor running, in a public area' and then ran from the police"); <u>James</u>, 534 F.3d at 873-74 (abandoned property rule applied to search of hotel room after defendant, on the day he was scheduled to check out, fled the hotel with his belongings); <u>Hoey</u>, 983 F.3d at 893 (abandoned property rule applied to apartment where the defendant was six weeks late on her rent, told her landlord that she was leaving, and held a moving sale); <u>Landry</u>, 154 F.3d at 899 (abandoned property rule applied to brown paper bag that defendant left by the wheel of a trash bin); and <u>Hawkins</u>, 116 Fed. Appx. at 778 (abandoned property rule applied to bag that defendant "consistently denied that he owned").

[18] <u>James</u>, 353 F.3d at 616 (abandoned property rule <u>did not</u> apply where defendant claimed ownership of the discs in question, which he "did not physically relinquish . . . in a way that demonstrates abandonment," but rather merely gave them to someone else to store);

### a.  The search warrant application sufficiently described the evidence sought with particularity.

"The language of a search warrant must describe the items to be seized with sufficient particularity: 'the language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized.'" United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995) (quoting United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992)).[19]

Defendant argues that this particularity requirement is not met because the application merely seeks permission to search the phone for "'electronically stored information in any form'" on the phone.  (Def.'s Mem. [Docket No. 41], at 14 (quoting Gov't's Ex. 1, Aff. Bonser, at 4, ¶ 23)).  Defendant equates such a broad application to "a request to rummage through Ms. Brown's personal communications," and argues that such "outright rummaging has never been permitted.  (Mot. Suppress Evid. [Docket No. 27], at 2, ¶ 3).

In fact, this District has repeatedly upheld search warrants that authorized broad searches of mobile phones.  For example, in Hollister, investigators obtained a warrant authorizing the search of four mobile phones for "[a]ny and all names, phone numbers, codes, messages, file ledgers, images, emails *or any other electronic information stored within the electronic equipment*."  2012 U.S. Dist. LEXIS 134091, at *29 (emphasis added).  In upholding that warrant, the Court[20] held that the warrant "describe[d] with particularity the place to be searched *and the items to be seized*, and the nexus between the place, the items and offense."  Id. at *49 (emphasis added).  Similarly, in United States v. Van Bui, No. 10-cr-311 (DWF/JJK), 2010 U.S.

---

[19] Additionally, "[a] search warrant must contain a description of the place to be searched in order to comply with the fourth amendment's particularity requirement."  United States v. Curry, 911 F.2d 72, 76 (8th Cir. 1990) (citing United States v. Alberts, 721 F.2d 636, 639 (8th Cir. 1983)).  In the present case, Defendant does not argue that the search warrant application failed to sufficiently describe the mobile phone in question.  In any event, the Court finds that the mobile phone was sufficiently described with particularity in the search warrant application, which identifies the phone by make, model, and MEID number.  (Gov't's Ex. 1, Aff. Bonser, at 1, ¶ 5).

[20] The Hon. Tony N. Leung, U.S. Magistrate Judge, presiding; affirmed by the Hon. Patrick J. Schiltz, U.S. District Judge.

Dist. LEXIS 139208 (D. Minn. Dec. 27, 2010) (Keyes, M.J.), adopted by 2011 U.S. Dist. LEXIS

1836 (D. Minn. Jan. 7, 2011) (Frank, J.), the Court upheld a warrant that authorized officers "to

search any names, phone numbers, messages, **_and other electronic information stored within_**

**_the electronic equipment of Defendant's cell phone_**." Id. at *3.  Defendant, on the other hand,

cites no case law, and this Court has found none, in which a court held that a search warrant

lacked particularity because it did not specify the type of electronically stored information that

could be seized.

Consistent with Hollister and Van Bui, this Court finds that the description of the

evidence to be seized from the mobile phone in question in the present case is set forth with

sufficient particularity in the application and search warrant.

> **b.  The search warrant application failed to establish a nexus between the alleged crime and the mobile phone in question; therefore, the application failed to provide probable cause to support issuance of the warrant.**

"Probable cause to issue a search warrant exists when an affidavit in support of the

warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or

evidence of' criminal activity will be found in the particular place to be searched." United States

v. Davis, 471 F.3d 938, 946 (8th Cir. 2006) (quoting Gates, 462 U.S. at 238).  Therefore, when

the "place" to be searched is a mobile phone, the application for the search warrant must set forth

facts sufficient to establish a "fair probability" that evidence of the alleged crime will be found in

that phone.  See, e.g., United States v. May, 440 F. Supp. 2d 1016, 1041 (D. Minn. 2006)

(Erickson, M.J.) (probable cause supported by text messages on cooperating witnesses's cell

phone), adopted by 440 F. Supp. 2d 1016 (Kyle, J.).[21]

---

[21] See also Hollister, 2012 U.S. Dist. LEXIS 134091, at *29 (probable cause where victim observed defendant talking, texting on cell phone); Van Bui, 2010 U.S. Dist. LEXIS 139208, at *11-12 (probable cause where affidavit verified multiple phone calls and text messages between defendant and a second suspect in the same drug

On the other hand where, as here, the application fails to establish a connection between the alleged crime and the phone in question, probable cause is lacking.  For example, in United States v. Bynum, No. 12-cr-172 (SRN/AJB), the affidavit described the robberies of two pharmacies, reports from citizens and law enforcement regarding a suspect vehicle, GPS tracking information, the arrests of the suspects, and the seizure of the subject cell phone.  2012 U.S. Dist. LEXIS 139386, at *14 (D. Minn. Aug. 30, 2012) (Boylan, C.M.J.).  On the basis of that affidavit, a warrant was issued authorizing the search of the phone for "call history, SMS and MMS data, photos and video, internet activity and forwarded calls."  Id. at *13.  However, the reviewing court held that the affidavit

> contain[ed] no particularized facts that establish a nexus between the phone and the West Seventh Pharmacy or any other criminal offense.  The mere statement that the subject cell phone was found in the search of defendant Bynum's house, a suspect was known to use the phone, and the phone was the subject of a pen register warrant does not establish a nexus between the object of the warrant and the alleged offense in this case.

Id. at 28, adopted by 2012 U.S. Dist. LEXIS 137855 (D. Minn. Sept. 26, 2012) (Nelson, J.).

In the present case, SA Bonser's affidavit, like the affidavit in Bynum, set forth no facts that would establish a "fair probability" that a search of the mobile phone in question would reveal evidence of the crime that Defendant is alleged to have committed.  The phone is not mentioned in any of the three witness statements described in the affidavit.  Although SA Bonser states in his affidavit that he "*believe[s]* that . . . there *could possibly* be evidence" on the phone, (Gov't's Ex. 1, Aff. Bonser, at 4, ¶ 22 (emphasis added)), he provides no *specific facts* from which the Court can conclude that there was a fair probability that the phone contained any such evidence.

---

investigation); United States v. Warren, No. 10-cr-276 (PJS/FLN), 2010 U.S. Dist. LEXIS 135179, at *1-5 (D. Minn. Dec. 1, 2010) (Noel, M.J.) (probable cause where affiant attested to his knowledge that cell phones are used in promoting prostitution and affidavit described phone calls from suspected prostitute to defendant), adopted by 2010 U.S. Dist. LEXIS 135071 (D. Minn. Dec. 21, 2010) (Schiltz, J).

The Government offers two reasons why there was probable cause to search the phone. First, the Government argues that "law enforcement needed to search the phone to identify the owner of the phone," because "[t]he presence of the defendant's phone at the crime scene is evidence that places the defendant at the murder scene." (Gov't Mem. [Docket No. 44], at 15). Although partially consistent with SA Bonser's testimony at the September 23, 2013, motions hearing,[22] ultimately this argument is not persuasive. Defendant had never denied that she was at the Lussier residence or that she fought with Mr. Lussier, and at the time he made his application SA Bonser had three additional witness statements placing her at the scene. Moreover, in his affidavit SA Bonser related that the phone's wallpaper screen showed a picture of Defendant, and that the phone itself matched the description Defendant gave of her own phone, strongly suggesting that SA Bonser had already determined that the phone belonged to Defendant. Finally, if SA Bonser's intent was merely to determine whether the phone belonged to Defendant, he could have asked her, or he could have sought that information from the wireless provider, or he could have sought a warrant authorizing a limited search of the phone for the purpose of identifying its owner. Instead, he sought a warrant authorizing him to seize any and all "electronically stored information in any form" on the phone. (Gov't Ex. 1, Aff. Bonser, at 4, ¶ 23). Thus, the simple search for the phone's owner cannot justify the sweeping warrant sought by SA Bonser.

Additionally, the Government argues that "law enforcement would want to examine the phone to determine if any calls, text messages or pictures were on the cell phone to explain the

---

[22] SA Bonser testified that one reason for searching the phone was to determine "who the phone belonged to *and what was on it*." (Hr'g. Tr. [Docket No. 40], at 62:15-16 (emphasis added)). His subsequent testimony strongly suggests that his primary interest was in what was on the phone. (See Id. at 79:9-20 (describing audio, video, and photographic information that can be obtained from cell phones); at 80:7-9 (Q. "And were you at that time interested to see whether or not there was any communication between [Defendant and her aunt] before the stabbing?" A. "Yes, I did."); at 82:10 (listing his interest in searching the phone for "[v]ideos, call logs, contact lists, everything.").

defendant's actions before and after the murder."  (Gov't Mem. [Docket No. 44], at 15).

Although the Court has no doubt that this statement accurately describes the Government's

interest in searching the phone, it does nothing to establish that the Government had probable

cause to do so.

Consequently, the Court finds that the search warrant for the content of the Defendant's

mobile phone was not supported by probable cause.

**3.   The <u>Leon</u> "good faith" doctrine does not apply in the present case.**

Even where a search warrant lacked probable cause, evidence obtained pursuant to that

warrant may be admitted under the "good faith" doctrine articulated by the U.S. Supreme Court

in <u>United States v. Leon</u>.  468 U.S. 897 (1984).  "Under the <u>Leon</u> good-faith exception, disputed

evidence will be admitted if it was objectively reasonable for the officer executing a search

warrant to have relied in good faith on the judge's determination that there was probable cause to

issue the warrant."  <u>Grant</u>, 490 F.3d at 632 (citing <u>Leon</u>, 468 U.S. at 922).  "The Supreme Court

has identified four circumstances in which an officer's reliance on a search warrant would be

objectively unreasonable:

> (1) when the affidavit or testimony in support of the warrant included a false
> statement made knowingly and intentionally or with reckless disregard for its
> truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned
> his judicial role" in issuing the warrant; (3) when the affidavit in support of the
> warrant was "so lacking in indicia of probable cause as to render official belief in
> its existence entirely unreasonable"; and (4) when the warrant is "so facially
> deficient" that the executing officer could not reasonably presume the warrant to
> be valid.

<u>Id.</u> at 632-33 (citing <u>Leon</u>, 468 U.S. at 923).  In the present case, there is no suggestion that the

search warrant application contained any false information or material omissions, or that

Magistrate Judge Klein abandoned her judicial role, or that the warrant was "facially deficient";

the issue is whether SA Bonser, in personally executing the warrant that he himself had applied

for, could have reasonably believed it to be based on a demonstration of probable cause.

In determining whether it was objectively reasonable for the executing officer to have

relied on the judge's determination that there was probable cause, a court must consider the

totality of the circumstances, "including any information known to the officer but not included in

the affidavit." Id. For example, in Bynum, although the court found that the search warrant

application lacked probable cause,

> the prior issuance of a court-authorized pen register as referenced in the affidavit
> is sufficient to establish the officer's good faith belief that a connection between
> the phone and criminal activity was stated. Furthermore, the affidavit reference to
> the prior residence search warrant, wherein the seizure of photographs and other
> materials relating to execution or planning of a pharmacy robbery was authorized,
> is indicative of the executing officer's reasonable belief that probable cause for
> the cell phone searches was established.

2012 U.S. Dist. LEXIS 139386, at *29-30 (citations to the record omitted). Having found that

the executing officer had a reasonable good-faith belief that probable cause had been established,

the Bynum court denied the motion to suppress evidence obtained during the search of the phone

in that case. Id.

However, in the present case the Government has put forth no evidence to suggest that

SA Bonser had knowledge of facts that might have contributed to a finding of probable cause,

but that he neglected to include in his affidavit in support of the warrant application. In fact, SA

Bonser specifically testified at the September 23, 2013, hearing that he had no information

concerning any prior communication between Defendant and any other party prior to or related

to the alleged crime at issue. (Hr'g Tr. [Docket No. 40], at 78:8-14). Additionally, the Court is

reluctant to find that SA Bonser, in executing the search warrant, had a reasonable good-faith

belief that the affidavit he prepared—an affidavit that he must have known lacked even a single

fact that would suggest that the phone in question likely could be expected to contain evidence of the crime alleged—sufficiently stated probable cause for the search.  See United States v. Baxter, 889 F.2d 731, 734 (6th Cir. 1989) (reversing district court's finding of good faith where "[t]he police officer [who executed the search warrant] himself was the source of the insufficient information").[23]  Both his affidavit in support of the warrant application and his testimony at the September 23, 2013, hearing indicated that SA Bonser had no specific facts to suggest a nexus between the content of the mobile phone and criminal activity, but rather, that he was merely speculating that the Defendant's mobile phone might contain information related to the alleged crime at issue; and he was interested in the contents of the mobile phone simply to follow up on his supposition.

To sum up, the Court finds that the Government has failed to show that Defendant abandoned her mobile phone in such a manner as to waive her reasonable expectation of privacy in the contents of that phone.  Additionally, the Court finds that the warrant authorizing the search of the content of Defendant's phone was not based on probable cause, and that the SA Bonser, who both made the application and executed the warrant, could not have had an objectively reasonable good-faith belief that the warrant was based on probable cause.  Accordingly, the Court recommends that Defendant's Motion to Suppress Evidence, [Docket No. 27], regarding the content of her mobile phone, be **GRANTED**.

---

[23] See also United States v. Mosley, 2008 U.S. Dist. LEXIS 34018, at *19-20 (E.D. Ky. Apr. 24, 2008) ("the Sixth Circuit has indicated that the Leon exception does not apply where an insufficient affidavit was prepared and submitted by the same officer who executes the warrant, and who should have realized the insufficiency of the affidavit" (citing Baxter)).

This Court previously addressed Mosley.  See United States v. Stately, No. 12-cr-89 (JRT/LIB), 2012 U.S. Dist. LEXIS 112782, at *32-33 n.16 (D. Minn. July 3, 2012) (Brisbois, M.J.), adopted by 2012 U.S. Dist. LEXIS 112416 (D. Minn. Aug. 10, 2012) (Tunheim, J.).  In Stately, the Court distinguished that case, in which the question was whether the omission of certain facts from the search warrant application effectively mislead the issuing magistrate, from Mosley, which concerned whether the search warrant application set forth sufficient facts, even if true, to establish probable cause.  Stately, 2012 U.S. Dist. LEXIS 112782, at *32-33 n.16.

Unlike Stately, the present case is on all fours with Mosley, as both cases concern whether a police officer who prepares a search warrant application that lacks probable cause can have a good faith belief in the validity of the warrant.

**V.      CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers,

    [Docket No. 28], be **DENIED**, as set forth above; and that

2.  Defendant's Pretrial Motion to Suppress Search and Seizure, [Docket No. 27], be

    **GRANTED**, as set forth above.

Dated: December 13, 2013                                    s/Leo I. Brisbois
                                                            LEO I. BRISBOIS
                                                            United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 27, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **fourteen days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.